ELLIS, Judge.
This is a suit for compensation in which the plaintiff is claiming total and permanent disability and $30 per week for not exceeding 400 weeks for an alleged accident he suffered on May 27, 1953, while employed by the defendant, Lormand. Plaintiff has joined the insurance carrier as party defendant.
Answer was filed by the defendant denying the contentions of the plaintiff by alleging that compensation has been paid for a period of 28 weeks at the rate of $24.05 per week, making a total of $673.40 and also certain medical expenses. While the plaintiff claims $30 per week the defendant alleges that his weekly wages were $37 per week. The answer further sets up as a defense that if the plaintiff had been hurt in the course and scope of his employment, which was denied, then in that event he had entirely recovered from any injury which he received, and that based on the reports of some physicians that had examined him, the compensation had been discontinued.
Shortly prior to the trial the defendant filed motion in which they tequested the appointment of Dr. Louis Meuleman, an orthopedic surgeon of Lafayette, Louisiana, and any other duly qualified orthopedic surgeon'to examine the plaintiff, which request was allegedly based upon the testimony of Dr. Blais Salatich that the condition of the plaintiff had been a progressive and developing one and that an examination of different sets of x-rays taken at different times led him to believe that the present disability to the plaintiff might not have originally been indicated.
After hearing on the motion the District Judge ordered the named doctor and D'r. Gilly to make this examination.
The case was tried, submitted and based upon written reasons, judgment was rendered in favor of the defendant rejecting the plaintiff’s demands, and he has appealed.
As contended by the defendants and admitted by the plaintiff his case presents largely questions of fact and naturally the defendant rests upon the doctrine of “lack of manifest error.”
It is shown that the plaintiff was examined by Dr. Karr, neu'rologist, Dr. Schlesinger, orthopedist, Dr. Meuleman, orthopedist, Dr. Salatich, orthopedist, Dr. Gilly, orthopedist, Dr. Trahan, general practitioner. A.s happens too frequently the medical testimony is greatly in conflict.
The District Judge clearly found that the injuries were established but the medical evidence as to the disabling effect discloses some conflict. He stated that the question to be determined was the extent of the injury, whether temporary or permanent. In this we agree. After discussing the testimony of the various doctors, the District Judge stated:
“Accepting the testimony of Dr. Gilly, wherein he states ‘that if any evidence of disability exists it exists in the field of the neuro-surgeon’, and the complainant having been examined by a neuro-surgeon (Dr. Karr) and the rupture with herniation of the interver-tebral disc having been ruled out by him (Karr), there remains no evidence of total permanent disability except the testimony of Dr. Trahan, a general practitioner, who saw and examined the plaintiff on several occasions and found him to be totally disabled with ruptured disc, and the testimony of Dr. Salatich, orthopedist,'who.stated there was a ruptured disc...
*139 “Therefore, the plaintiff has not proved his case by a preponderance of the evidence and his demands will be rejected.”
Dr. Meuleman disagreed with Dr. Gilly’s statement by testifying “that the neurosurgeons feel that the orthopedists should not do this surgery, and by the same token a good many orthopedists feel that disc surgery is primarily an orthopedic problem.” As Dr. Karr was the only neurosurgeon produced as a witness, the effect of the lower court’s decision is to leave the question of plaintiff’s disability entirely up to him.
A somewhat thorough discussion of the lay and medical evidence is necessary to a proper decision of this case.
On May 27, 1953 the plaintiff in the course and scope of his employment was handling a gravel scoop attached to a chain which was fastened to a truck. The gravel scoop was being used to unload gravel from another truck. In doing this the plaintiff was holding the scoop while the truck pulled it through the gravel in order to load it. On the day stated the front of the scoop hung on something in the bottom of the truck which naturally caused the handles to come up and forward and the plaintiff, in attempting to hold the scoop, was jerked and fell on his right .side in somewhat of a twisted position on the gravel in the truck. He at that time told a fellow worker that he had hurt his back but it was not until after he had gone to eat his dinner that the pain became unbearable. He reported to his foreman who loaned him a pick-up truck and he went to see Dr. Trahan.
It would be useless to detail the testimony as to whether plaintiff suffered an accident as there is no doubt that he did. The only question, as stated, is as to disability if any.
In evaluating the testimony in this case it might be well to remember that the doctors who knew the plaintiff best and treated him longest did not consider him as a malingerer in any sense of the word. We are particularly referring to Dr. Trahan, who treated him at the time of his injury and who was still seeing plaintiff at the time of the trial, which was on March 18, 1954, and Dr. Gilly who saw and examined the plaintiff some 12 times. In fact, no doctor testified that plaintiff was a malingerer, but Doctors Karr, Schlesinger and Meuleman thought that plaintiff was exaggerating his symptoms of pain.
Dr. Trahan testified that he was a general practitioner and that on May 27, 1953, the plaintiff came to his office complaining of back pain. An examination at that time revealed a well developed male who was walking with a limp and bent over double and his pertinent findings then were all to the back, where he found extreme tender-' ness along the latisimus dorsal muscles, which he interpreted as spasm of the muscles. At this time Dr. Trahan located the extreme tenderness along lumbar vertebrae one and two and severe spasm of the back muscles on the right side. Dr. Trahan stated that the patient at the time of this first visit “could just about get around the pain was so severe.” There was no doubt in his mind that the man was in trouble, and did have pain. He examined him thereafter thirty or forty times and has treated him regularly since the accident. Dr. Tra-han’s examinations and findings and conclusions are summed up in the following testimony:
“A. Mr. Thibodeaux was seen, he was examined by me, sent home on bed rest, conservative treatment, and his back was strapped as any ordinary back injury would be, and told to return in two or three days to my office to check him. When the man returned there was some improvement so he was told to return again in three or four days, and when he did come back the symptoms got worse. The man was complaining of more pain. However, the objective findings were about the same, still had tenderness in that area. He was then referred here to Lafayette to Drs. Miles and Romagosa for AP and lateral views of his back, sacroiliac region. This was done and the report came back from Drs. Miles and Roma- *140 gosa as being negative; no bony pathology found. • However,' the subjective complaints of this patient continued to • increase. Approximately two weeks after the original injury he began to complain of pain radiating along the course of the right thigh, posterior aspect of the thigh. This then suggested to me the possibility of nerve root injury which, being a general practitioner, I felt my duty to refer him to a specialist which I did. I referred him to Dr. James Gilly, orthopedist, here in Lafayette. Dr. Gilly examined this man, consultation, and referred him back to me, concurred in my findings, and suggested that I continue conservative treatment which consisted of bed rejst and sedation. This man kept coming to my office every two or three days. Approximately a month or a month and a half after the original injury the pain got extreme worse. He was again referred to Dr. Gilly. He then suggested that we hospitalize this man and treat him with Buck’s extension. This was done. This man was hospitalized at Our Lady of Lourdes under the care of Dr. Gilly. I did not see this ■ man in the hospital because Dr. Gilly was in charge of him. He stayed approximately a .week and the symptoms got better. The man was relieved from his pain, not altogether, but he was able to get around pretty well. : We 'then suggested that he buy a corset, a type of support, which he- did.. • This offered him some relief but .every two or three weeks .he would, have a recurrence of the symptoms, his symptoms became worse. This condition ■ continued that Way, in fact, I was obliged at intervals to give him opiates to relieve his pain. The condition, took a turn for the worse in February, 19S4.: I was called to.see this man at his home in Scott. On arriving there the man was in extreme pain, unable to sit down; his right leg was in extension, and examination and also symptoms at that time was that the pain not only radiated along the thigh but also into the leg. On examination at that time he still had tenderness of his back muscles, spasm of his back muscles rather, and tenderness along L-l and L-2. Also at this time he revealed areas of anesthesia along the lateral aspect of his leg and his foot. On questioning this man it was found that he was extremely aggravated, his pain was extremely aggravated by any motion, also on-coughing and sneezing. It then suggested to me that this man possibly or probably had a herniated inter-vertebral disc. 'Now, that is about the course of the man’s illness. I have seen him at the office since then; there has been no improvement. It is common in this type of disorder you have periods of remission and exacerbation. A man may get along well for two or three weeks; any slight movement such as tying one’s shoe or bending over will extremely aggravate the symptoms and exacerbate the condition again.
“Q. In other words, the remission and exacerbation of the symptoms is a common factor related to a condition of herniated intervertebral disc? A. Yes, sir, it is a characteristic of inter-vertebral disc.
“Q. . How along ago was it that you last examined Mr. Thibodeaux? A. Mr. Thibodeaux .was in my office last week.
“Q. And at that last examination did you determine whether or not the symptoms which you have described tha.t persisted throughout the period of your treatment of him existed at that time too ? A. It is my opinion that the symptoms are still present and so are the physical findings.
. “Q. In other words, doctor, it is your opinion from the symptoms that you elicited by your clinical examination that this man is suffering from a herniated intervertebral disc in the lower back area? A. Yes, sir.
“Q. Did you localize the particular area in the back where this interverte-bral disc may exist? A. Not being an orthopedic surgeon or anything like *141 that, and through my findings I think' the lesions are somewhere around L-l and L-2.
“Q. And that is the lumbar verte- ■ bra? A. Lumbar Vertebra.
“Q. You have been in close and frequent contact with this man from the onset of his injury, is that right?
A. Yes, sir.
“Q. Doctor, from what you have observed and considering the nature of the injury which you feel that he is suffering from at this time what would be your prognosis -of this man in relation to his ability to engage in activities imposing heavily or generally on the area of the back involved? A. At this' time it’s my opinion that this man is incapacitated and in further need of treatment, specialized treatment.
“Q. What is the extent of the incapacity at this time? A. This man may be able to do desk work but he would certainly be unable to: do any • type of manual labor involving muscular activities of his back.
“Q. In other words, he is one hundred (100%) per cent disabled to engage in any physical labor? A. ' That’s right.”
This doctor under cross examination. readily admitted that he had not specialized in neurology -or orthopedics and therefore did not 'qualify himself as an expert in that practice, but doggedly stuck to his opinion as to the plaintiff’s disability and what' he had found. He stated under cross examination that other than the pain which the ' plaintiff had evidenced, he also found spasm of the back muscles, tenderness of the back' area already described, and areas of anesthesia’along the lateral aspect of the right leg and right foot. He first observed this anesthesia in the month of February 1954 on a visit to plaintiff’s home to treat him. This date might be of importance in view of the fact that Dr. Karr and Dr. Schlesinger did not find any anesthesia but their examination was made on December 7, 1953. It is also important in our opinion that Dr. Tra-han testified that he gave the plaintiff a “complete examination practically once every two weeks.”
Dr. Gilly, orthopedist of Lafayette, Louisiana, first saw and examined the plaintiff on July 3,1953, at the request of Dr. Trahan, and at that time the plaintiff’s chief complaint was pain in his lower back. Dr. Gilly at this time as a result of the examination found that the plaintiff walked with a cautious gait and had moderate bilateral muscle spasm and all movements of the back were restricted approximately 50%. Tenderness was about equal bilaterally and there was tenderness over the spinus processes of the ninth and tenth dorsal vertebrae as well as the fifth lumbar vertebra. Dr. Gilly stated that the leg test used in diagnosing disorders of the low back, particularly the left sacroiliac and lumbosacral' test were strongly positive. He found at this time that the neurological examination of the lower abdomen and both lower extremities showed that there was some slight diminution to pin prick ovhr the right arter-iormédial aspect of the thigh on the right leg. Dr. Gilly at this time referred the plaintiff to x-ray specialists who made views of the lower dorsal spine and his review of these plates as well as the review of the plates which were previously taken by Dr. Trahan revealed no evidence of fracture, dislocation or bone disease, however in the lower lumbar'segments he found" moderate spurring of the spinous processes of the fourth and fifth lumbar vertebrae. This could be significant as some.of the doctors found plaintiff’s trouble ■ located either in the .fourth or between the fourth and "fifth lumbar vertebrae. It was Dr. Gilly’s opinion at this time that the plaintiff had sustained a moderately severe'lumbosacral strain combined with a twisted sacroiliac strain On the left side. He recommended the continuation of diathermy treatments for a period of about four weeks and anti-spasmodic drugs such as Tolserol to be given in doses of two grams four to five times a day. He expressed a desire to see the plaintiff again in approximately six weeks to evaluate his progress.
*142 Dr. Gilly’s next report to Dr. Trahan was dated August 31, 1953, in which he stated that since his,first examination of the plain-, tiff on July 3 and his last report on July 9th he had re-examined him three times in his office. On the date of the last examination plaintiff was complaining of rather severe early morning stiffness with some radiation of pain down the posterior aspect of the right leg as far as the knee, however he showed a normal gait although it was performed in a cautious manner. Dr. Gilly, found mild bilateral muscle spasm present but found the movement in the lumbar spine to be restricted approximately 25% with a slight pull to the right in forward flexion. The neurological examination at this time failed to reveal any positive find7 ings, however the lumbosacral test was still markedly positive. Dr. Gilly stated that the patient at that time had had six weeks of ambulatory conservative treatment without improvement, and he therefore recommended that the patient be hospitalized and placed in bilateral Buck’s extension traction on a boarded bed with approximately four pounds of weight on each lower extremity, and that this treatment continue until the pain in the back and in the leg disappeared. He recommended that after removal of the traction that the plaintiff be placed in a “formidable body cast” which should reach from the nipple line to the trochanters of both, hips, and that he wear this cast for a period of about six weeks, and that during this time he could be ambulatory in. the ■' cast but no diathermy treatments should be given. After removal of the cast he' recommended the reinstitution of the diathermy treatments and exercises.' Dr. Gilly stated in this report that the patient’s' response had been extremely slow and he felt that some of that was due to structural changes which predated the injury, and I presume he is referring to the spurring shown by the x-rays heretofore discussed.
On October 5, 1953, Dr. Gilly rendered another report to Dr. Trahan in which he stated that since his last report of August 3, 1953, the treatment outlined in that report had been carried out and that following the plaintiff’s discharge from the hospital he was moderately asymptomatic and felt so much relief from pain that his plaster of parís cast was not applied but a corset was refitted. He stated that the plaintiff remained asymptomatic for about two weeks and again commenced to complain that the pain in his back had recurred and felt as if the bones were loose and rubbing. Plaintiff at the time of this examination denied radiation into either lower extremity. Dr. Gilly in this report stated that physical examination was again performed on September 30, 1953 and at that time motion of the lumbar spine was found to be limited approximately 50% in all directions, however, the back remained in midline and there was no longer any pull to the right. He found moderate bilaterally muscle spasm present which was thought to be more than was present at the time of the previous report of August 31. He stated that the patient after having apparently made a good recovery from traction treatment had had a recurrence of his pain and apparently a greater increase in the muscle spasticity and increase in the loss of movement in his back. He stated: “We are again administering rather large doses of Tolserol and will evaluate this man from the standpoint of motion in apparently one week.” Tolserol as was heretofore noted is a medicine for muscle spasm.
He stated that at the time of this examination there remained a completely negative neurological finding.
On November 20, 1953, Dr. Gilly again submitted a report to Dr. Trahan in which, he stated that since his last report on October 5, 1953, he had seen the plaintiff on several occasions and that on the date of the last two examinations he was still complaining of pain in his lower back which radiated toward his right hip. He still found definite restriction of motion present with a definite list to the right which was accentuated by forward flexion. He states that the neurological examination at this time disclosed the fact that there was some loss of sensation to pin prick along the medial aspect of the right calf with some diminution of the patella reflex on the right. He stated: “This is extremely suggestive, *143 to me, of some nerve pressure at the fourth lumbar level and I believe it would be wise at this time to have the patient seen and evaluated by a neurological surgeon.” He still believed as a result of this examination as shown by this report that the plaintiff showed definite disability as far as returning to work was concerned.
On January 7, 1954, Dr. Gilly again submitted a written report to Dr. Trahan in which he stated that since his last report on November 24, 1953, he had seen the plaintiff in his office on three occasions. His examination of November 24, 1953, showed some voluntary restriction of motion in the back with a complete clearing of the list to the right. The medial numbness in the right calf was still present. Dr. Gilly stated that plaintiff returned on December 8, 1953 and told them that he had seen Dr. Karr in New Orleans at which time Dr. Gilly had not received Karr’s report. He returned on December 17, 1953, complaining of pain in his low back without any radiation to either lower extremity. Dr. Gilly found the muscle spasm of the erector spinae groups in the lumbar area stood out rigidly with the patient standing, however, they relaxed with the patient standing alternately on his right and on his left foot. The leg tests used in diagnosing disorders of the low back were all negative on that examination, however, neurological examination revealed that the medial numbness of the right calf was still present. He stated that with the patient’s attention distracted from the fact that he was using his back he was able to 'sit up on the table with both legs extended in front of him which was in sharp distinction to the fact that 80% of his motion was restricted on standing. He informed the patient that at this time that his findings consisted only of medial numbness in the right calf and that his disability if any was present only in the neurosurgical field. He stated: “At the time of this examination I felt definitely that the patient was exaggerating his findings and that our ’ findings with regard to his complaints of low' back pain failed to show any disability at this date.”
The next examination by Dr. Gilly was made upon order of the Court at the request of counsel for defendants, and on April 5, 1954, he rendered the following report: He stated that the plaintiff returned to his office as requested by letter of March 30, 1954, and further additional x-ray studies were secured which completed the examination. In this report it seems that he’ originally examined the patient at the request of the Court on March 23, 1954, at which time plaintiff stated that he was experiencing pain in his low back and into his right hip. Plaintiff told him that following his discharge by Gilly in January, 1954, he had contacted a head cold which caused him to cough and sneeze a great deal and that during one of these paroxysms plaintiff noted a sudden onset of pain radiating from his right hip down the posterior aspect of his right leg as far as his heel, and he experienced difficulty in moving the leg due to the fact that the pain was aggravated by any such movement. Plaintiff stated to Dr. Gilly at this time that this acute episode of pain lasted approximately two days and he was obliged to call Dr. Trahan to give him medication for the relief of this pain. He complained of constant pain in his hip and in his back which started in the back and radiated • toward" the right hip. Plaintiff also told Dr. Gilly that he had inconstant episodes of leg pain which he described as “momentary shooting twinges of pain.” Dr. Gilly’s examination at this time revealed only mild flattening of the normal lumbar lordotic curve, and that the plaintiff walked with a shuffling gait but with no definite limp. He found that with the patient standing alternately on his right foot and on his left foot there was some relaxation of the erector spinae muscle spasm, however, this was not complete. Forward flexion was restricted approximately 60% with the patient standing and there was a slight pull to the right on forward flexion. Left lateral bending was restricted approximately 75%. The plaintiff complained of tenderness to presr sure over the spinous process of the fifth lumbar vertebra and just to the right of the fifth lumbar spine. With the patient examined prone there was a moderate amount of *144 muscle spasm present in the right erector spinae muscle group, while the left erector spinae muscle group relaxed completely. In performing the various leg tests, the plaintiff complained of pain in the region of the low back and the right hip with the right hip flexed to approximately 30 degrees with the knee extended. The left straight leg raising test was negative. He found the lumbosacral and sacroiliac tests were likewise negative. The pin prick perception showed that the patient complained of lack of perception to pin prick on the medial aspect of his right calf down to the medial aspect of the right foot as far as the base of the big toe. From a review of the x-rays that had been taken of the plaintiff he found an area of calsification in the ligament between the first and second lumbar vertebral bodies, and no evidence of fusion. From the x-rays of the lumbosacral area taken, reviewed and compared with the previous plates he found no evidence of fracture, dislocation or arthritis, with the exception of minimal spurring on the anteri- or superior border of the body of -the fourth lumbar vertebra. In this report he stated that as a result of the history and physical examination there were subjective complaints of pain , in- the low back with' sciatic radiation into the right leg, muscle spasm present on the right side of the low back which does not relax on alternate foot standing or when the patient is prone. There was also an area of loss of perception to pin prick over the medial aspect of the right calf. He then states that none of these findings can strictly be demon-, strated objectively, however, he still felt that if any evidence of disability exists it exists in the field of the neurosurgeon and that if he can rule out a rupture of the annulus fibrosis with a herniation of the interverte-bral disc between the fourth and fifth lumbar vertebrae, that the man shows no definite objective evidence of disability.
Dr. Gilly in testifying was interrogated and answered as follows:
“Q. Doctor, I am not going to ask you to restate your report because I think it forms an official part of the record. Now I will ask you this. Your conclusion, doctor, was that the only question was whether or not this man had a rupture of the annulus fibrosis with a herniation of the intervertebral disc between the fourth and fifth lumbar vertebrae, is that correct? A. That is correct.
“Q. You haven’t been able to rule that out? A. No, sir.
“Q. What made you suspect the existence of the particular pathology ? A. The history of acute exacerbation of leg pain after the patient had contracted a cold, plus a mild flattening of the lumbar curve, plus the slight pull to the right on forward flexion. It was also the complaint that the patient could not perceive pin prick, on the inner aspect of his calf as well as he .could- on the outer aspect of the calf. That had been a finding previously which had not been maintained, so to a certain extent it was a return of the previous physical finding which excited my suspicion.
“Q. In other words, doctor, your previous examination, before this court appointed examination, there had been some complaint of pain in the general area of this lumbar vertebrae, the 4th and 5th? A. Well, .there was complaint of lumbar pain, yes.
“Q. Would you say, doctor, that the symptoms which you have found to exist would be consistent with the diagnosis of rupture of the annulus fibrosis with a herniation of the inter-vertebral disc between the fourth and fifth lumbar vertebrae? A. The his-' tory is consistent and the complaints and findings are consistent but are not conclusive.”
Dr. Gilly frankly admitted that a rupture of the fourth lumbar intervertebral disc was difficult to diagnose relying completely on physical findings. The only other way, however, would be by myelogram. He testified that the physical or clinical symptoms indicated that the disc rupture involved “a disc which is located between *145 the fourth and fifth lumbar vertebrae or the fourth disc.” He also stated that “From a strictly honest and impersonal standpoint of view that is a very difficult disc to make a conclusive- diagnosis of.” Dr. Gilly again testified as follows:
“Q. Now, on that occasion of your last examination you found erector spinae muscle spasm did you not? A. Yes, sir.
“Q. Now, erector spinae muscle spasm is an objective sign of some condition or disorder of the back? A. Not always; I mean it’s one of the things that may be present, it can be assumed by the patient.
“Q. You are not suggesting that on this last occasion it was assumed by the patient? A. No, sir, the .only thing I am stating is that it is not a completely objective finding.
“Q. But you do use that ? A. It is a link in the chain, yes, sir.
“Q. Very substantial finding. As I recall you said you may eliminate a pathology or condition or disorder of the low back because of the absence of erector spinae spasm? A. That i,s correct. The absence of it sometimes is of more importance than the presence.
“Q. You found limitation of motion, of forward flexion to be about sixty percent? A. Yes, sir.
“Q. And you also found that there was a slight pulling to the right on for-' ward flexion? A. Yes, sir.
“Q. And that right lateral bending was restricted approximately seventy-five per cent? A. Yes, sir.
“Q. And there was also tenderness over the spinous process of the fifth lumbar vertebra ? A. Yes, sir.
“Q. And just to the right of the fifth lumbar spine? A. Yes, sir.
“Q. Did you apply certain various leg tests?, A. Yes, sir.
“Q. And were they positive for low back pathology or disorder? A. The right straight leg raising test was positive inasmuch as it referred pain to the hip area but not conclusively positive for a sciatic pain..
“Q. Was the referral- of pain consistent with the leg test or the objective sought to be discovered by the leg test? A. Partially so. In a patient with a sciatica a straight leg raising test should reproduce the sciatic radiation of pain. In this instance the radiation was partially reproduced.
“Q. Doctor, you also found a lack of sensation or perception of pinprick? A. Yes, sir..
“Q. On the — especially on the medial aspect of the right calf down to the medial aspect of the right foot?
A. Yes,, sir.
“Q. Is that consistent with the possible existence of herniation that I referred-to previously? A. Yes, sir. .
. “Q. How many' times have you examined Mr. Thibodeaux? A. One,, two, three, four (witness looks at his-notes and counts) five, six, seven, eight,, nine, ten, eleven, twelve times.
“Q. Was he a cooperative patient throughout? A. Yes, sir.
“Q. Would you call him a malingerer? A. No, sir.”
On cross examination Dr. Gilly was questioned with regard to objective findings and stated that he did not find any objective evidence of disability and that he would consider the opinion of a neurosurgeon as to whether or not plaintiff had a ruptured disc of importance in the diagnosing of his condition. He also stated that he found no fusion. It is interesting to note on re-direct examination Dr. Gilly testified as follows:
“Q. Would you tell me what objective evidence was not there that would be completely objective? A. Well, that is the problem. I stated *146 that the diagnosis of a herniation of the fourth lumbar disc is difficult to make on a clinical basis and because of the extreme scarcity or almost complete absence of objective findings excluded the myelogram.
“Q. In other words that would be the completely objective evidence, a myelogram? A. Yes, sir.
“Q. Now, the other objective evidence was present ? A. In the herniation of a fourth lumbar disc the problem of making a clinical diagnosis is that there aren’t any really objective findings and it is an extremely difficult diagnosis to establish to the point where you would subject the patient to surgery without confirmation.
“Q. At least there is the presumptive .evidence of herniation of the type you describe? A. And a presumptive impression of a herniation, yes, sir.”
Dr. Gilly was of the opinion that spurring shown in the x-ray had no connection with plaintiff’s complaints. Without- detailing the complete similarity between Dr. Gilly’s findings and beliefs as a result of his examinations as shown on his reports and his testimony, practically all of his major findings point to a herniated disc in the region of the fourth or fifth lumbar vertebrae. There is no doubt that Dr. Gilly found all the symptoms of a herniated disc, and the only thing left in his opinion would have been a myelogram. In our opinion his testimony is strongly in favor of the plaintiff’s total disability. We so interpret it.
Dr. Karr examined the plaintiff on December 7, 1953 and testified that after a. thorough neurological examination to de-, termine whether or not there was any disability present in the plaintiff, he found no evidence of such and in his opinion the plaintiff was able to resume his work as an ordinary laborer. Dr. Karr examined some of the x-ray pictures but ndt the'ones made by the Lafayette radiologist, but stated that the reason he did not make any comparative studies of those x-rays was because none was required. He based this statement on the x-ray findings as disclosed on December 7, 1953, when he examined the plaintiff. According to his testimony he found nothing that would indicate a herniated disc, no muscle spasm, no limited motion of the back, no tenderness, absolutely nothing. He simply and positively stated in regard to the plaintiff: “He does not have the symptoms nor the signs of a ruptured disc.”
Dr. Lee Schlesinger testified that he made a complete examination of the plaintiff’s back and lower extremities. As to this examination he testified:
“This is a typical southwest Louisiana French type man with a Cajun accent, ruddy complexion, and generally healthy build. He is five feet eight inches in height and weighs one hundred seventy-five pounds according to his estimate. He undresses rather slowly, showing that he is wearing a corset which is evidently much too small for him as he has only the bottom button attaching it, the rest remaining open. This is perhaps due to a gain in weight by the patient, as he has a moderately large, healthy looking abdomen.
“As soon as he is completely unclothed, he begins to hold himself rather rigid, but after repeated walking on toes and heels, the back relaxes and it is seen that he has no postural defects. There is no limp or list, the head is centered over the trunk, and the shoulder and pelvis are level. There is no scoliosis and no loss of lumbar lordosis.
“Movements of the trunk are voluntarily restricted by the patient, but with repetition of movements of the spine in all directions, it is seen that there is flexibility here and that the guarding is all on the part of the patient himself.
“No muscle spasm is encountered and no localization of tenderness can be found in the back, as he can be- *147 easily distracted from one tender area to the .other without following any physiological pattern. With the patient ■ sitting on the table, with his knees flexed to ninety degrees, he bends better than he does in the standing position,, but still grunts and groans. Knee and ankle reflexes are equal and active. With the patient sitting on the table with hips flexed and knees extended, he is not able to touch his toes, but shows good rounding of the lumbar spine.
“With the patient lying completely supine, he will actively raise his legs with knees extended only fifteen degrees, saying that he can go no farther; yet when he is asked to bring the foot toward the mouth so that hip and knee are bent and rotated, he can bring the toe as far as two inches above the umbilicus before he complains of pain. It is accompanied with some flexion of the spine and the head, and it is obvious that the allegation of straight leg raising are false.
“With knees and hips flexed to nine- . ty degrees, he complains bitterly of . pain, although when he was sitting in the same position, he did not complain. Rotation of the pelvis shows no limitation. There is no discrepancy of leg length or circumferential measurements at mid-thigh or mid-calf. With the-patient lying prone, hyper-extension of the spine shows good flexibility of the lumbar region. The Patrie Test is negative.
“X-rays number 125316 were made at the radiological offices of Drs. Teitel-baum and Leyi. Except for minor liga-mentous calcification, high in the lumbar region, no evidence of recent or old injury or disease is noted. For all purposes, the spinal pictures are completely negative for injury or disease.”
Again he testified:
“Q. What were your conclusions, as a result of your examination, Doctor?
A. My physical examination, from an orthopedic standpoint, was completely negative. I found no objective findings of disalignment, muscle spasm, reflex change, limited motion of the spine, no true localized evidence of any subjective tenderness, and in view of that, plus the negative x-ray findings, I felt that if there had been disability present at the time of injury, it had subsided as of the date that I examined him.
“Q. Doctor, did these x-rays that you examined show some ligamentous calcification? A. Yes, sir, tfiere was evidence of some ligamentous calcification in the upper lumbar segments. The first and second lumbar vertebrae bad some calcific changes in the ligaments ; that could be seen on the x-ray pictures.
“Q. Did you find any evidence of hypertrophic arthritis? A. No, sir.
“Q. Was there any evidence of fusion of any of the vertebrae? A. No; no evidence of fusion.
“Q. Doctor, would this ligamentous calcification that you found, in your opinion, be in any way disabling? A. I did not believe so, no.
“Q. As á result of your examination, did you find anything that would indicate to you that this man had any symptoms of a ruptured disc? A. No, sir.
“Q. As a result of your complete examination, are you in a position to state whether, in your opinion, this man was disabled as a result of the alleged accident? A. Well, I cannot state, as of the date of my examination whether he might not have been temporarily disabled at the time of the injury because he was injured in May, 1953, and I saw him in December. There was no evidence of residual in my opinion at that time.
“Q. In other words, in December of 1953, when you performed your *148 examination, • was it your option that he could return to • his usual work as ■ a laborer? A. Yes, sir.”
On December 7, 1953, when this plaintiff was examined by Drs. Karr and Schle-sing'er they were practically in accord as to their findings which were all negative as to any disability in the plaintiff’s back or any signs of a ruptured disc. Their testimony and findings are in sharp discord with those of Dr. Trahan and Dr. Gilly.
It is well established in this record that a ruptured disc has periods of activity and inactivity. *At times the plaintiff is in extreme pain and then it will subside and for a time the plaintiff will have no pain, and if we are to give full effect to the testimony of all four of these doctors it can only be done on the theory that at the time that Dr. Karr and Dr. Schlesinger examined the plaintiff his disabling condition of a herniated disc, if he had one, was in a period of inactivity. Drs. Gilly and Trahan had seen the plaintiff from the beginning of his trouble, had examined and treated him many times up to the date of the trial and were, therefore, better acquainted with the plaintiff and the various symptoms they found, and further both of these' doctors-testified that plaintiff was not a malingerer. It was only on one occasion that Dr. Gilly thought plaintiff was exaggerating. He did not state that the plaintiff was exaggerating when he examined him the last time at the request of .the Court. Drs. Karr and Schlesinger saw this man once and their examination covered a period of approximately 45 minutes. 1
In addition to the above, medical testimony, we have that of Dr. Salatich, an orthopedist, in the City of New Orleans, who was of the opinion- from an examination made on February 12, 1954, that the plaintiff had sustained:
“1. Torsion exertion-type low back injury involving intervertebral disc, with nerve root compression’ lower lumbar level, right, associated with residual dysfunction and low-back pain.
“2. Progressive hypertrophic arthritis with attempt at -fusion and diminished -interspace between first and second lumbar vertebrae, progressive hypertrophic arthritis involving fifth lumbar vertebra.
“My opinion was that this orthopedic examination involved a well developed and nourished 39 year old white male,, of medium height, stocky stature, describing a back injury sustained on May 27, 1953, answering apparently intelligently and sincerely on questioning. The medical and orthopedic regime described by this patient was considered . significant in reference to presenting symptoms during that period of time involving adhesive strapping immobilization of the lum-bosacral region for approximately three or four weeks, followed by cloth lumbosacral corset stabilization, including, bilateral Buck’s extension sustained leg traction during a period of hospitalization.
“The subjective complaints described by this individual, including positive clinical findings, demonstrated on orthopedic examination, were considered to be apparently well founded and consistent with such a back' injury, coming well within the limits of expectancy under such circumstances. The positive subjective and objective clinical findings presented at this time were considered to' ' be sufficiently significant as to location-and severity5 to warrant inability to carry on- imposing physical activities referable to his lower trunk, back and lower extremities with specific emphasis made on the lumbosacral region.
“This patient is considered to be totally disabled at this time in reference to- the occupationally traumatizing physical activities as required of him, especially such imposing physical activities demanding any undue amount of sustained effort, stamina and exertion. This patient presents definite *149 indications at this- time for further orthopedic treatment if a maximum-effort is to be made to- rehabilitate him to any degree, including- relief of his somewhat distressing and persisting low back complaints.
“This patient cooperated fully during this entire examination.
“Q. What is your opinion as to the. man’s ability at this time to engage in any type of labor that would impose on the lower back region such as manual labor? A. In view of the clinical findings, both subjective and objective that I had occasion to demonstrate .and note, substantiated by radio-graphic survey of the involved portion of his back, including comparison with radiographic examination made approximately eight months prior to my examination, I am of the opinion that this man must be considered -unable to carry on imposing occupations or imposing physical activities of any nature, which would impose suffi■ciently strenuously on his lower trunk and back and lower extremities, especially such activities that require sustained effort, stamina and exertion.”
Dr. Salatich was of the opinion that the •disc involved was either at the lumbar .sacral level or between the fourth and fifth.
Dr. Meuleman examined the plaintiff at the request of the Court on March 22,; 1954, which was one day prior to .Dr. Gilly’s . last examination. From his ■ report and-testimony he gave the plaintiff a thorough -examination and he observed that. plain- ¡ tiff appeared reasonably comfortable sitting 1 in a straight chair, did not squirm,, fidget -or change position unduly.- Further, that when he purposely lowered- the tone of his . ■voice the patient leaned forward apparently without effort to catch the question,, and he further found plaintiff’s walking gait .shuffling and slow but no apparent limp with the shoes on. He also found that the lumbar curve was neither exaggerated nor decreased and there was no palpable muscle spasm. He asked the plaintiff to outline the areas of pain in the back, which he said was in his back and leg, and he outlined an area approximately three inches in diameter- in the region of the lumbosacral joint. Plaintiff also stated that the most severe pain is to the right. of the midline which passes from this point to the posterior aspect of -the hip and then down the posterior aspect of the thigh to the region of the knee,- and that when the pain passed below the. knee it came along the inner side of the ,leg. Plaintiff’s complaints were much the same as they had been. Dr. Meuleman observed no muscle spasm while the plaintiff was walking. Dr. Meuleman also tested plaintiff’s back muscles in a sitting position, and asked the plaintiff to forward flex and the plaintiff leaned forward apparently thirty degrees and stated that he was unable to go further because of severe pain in the back.. Dr. Meuleman at this time stated no muscle spasm was demonstrated. He stated that from the erect position and on right and left lateral bendings, there were equal bendings to both sides with the vertebral column participating throughout and the movements were done without muscle spasm. The plaintiff as this time complained of pain in the low back. The doctor stated that extension was impossible because of pain. He then tested plaintiff’s, muscles in a seated position. He found that when the patient was seated and intimates that plaintiff apparently was not watching him, he saw that the patient slumped forward in the position most individuals take when seated, and the lumbar curve was seen to reverse which is normal.. Dr. Meuleman stated that when he tested the back movements, in the seated position, plaintiff came to an erect posture and on attempting a, forward flexion he leaned forward at the hips keep,-ing the entire vertebral column stiff. He still found, ,no muscle spasm. There was no muscie .spasm .apparent when patient did a right and left lateral bend. The doctor states, however, that on performing all these movements plaintiff complained of pain in his back. Dr. Meuleman attempted to give the plaintiff certain tests in a supine position and it was his opinion in a supine and sitting position at no time did *150 he find any muscle spasm, and he states that the patient would permit or would not permit, meaning that there was an apparent voluntary muscular power resisting the various tests. He found no undue tenderness on either the right or left side and the sciatic nerve in the posterior aspect of the thigh was not tender to palpation. He stated that the deep reflexes of the lower extremities were intact and equal and that plaintiff’s sensory perception to pin prick and light touch was appreciated through both lower extremities and a muscle examination failed to reveal any weakness. He stated that the plaintiff would not permit sufficient cooperation to employ the tests to demonstrate nerve root or sciatic nerve irritability.
Dr. Meuleman’s observance of the x-rays revealed nothing disabling of the back with no progression of the calcific deposits. On the basis of his clinical examination he stated that the plaintiff did not give his wholehearted cooperation and it was his feeling that plaintiff was grossly exaggerating his complaints. He detailed his reasons for this statement, for example he stated that all during the examination the patient complained of severe pain in the back, and yet, with his hands in the small of the plaintiff’s back there was no muscle spasm or even muscle tightness, and he therefore concluded that plaintiff’s complaints were a gross exaggeration. He stated that he found nothing in this one examination which would indicate any nerve root irritation or anything which would lead one to suspect that this man has a herniated intervertebral disc. He was of the opinion that the plaintiff had no disability which would prevent him from seeking gainful employment. It will be noted that the testimony of Dr. Meuleman taken one day prior to Dr. Gilly’s last examination is in direct conflict with Dr. Gilly’s findings. His only explanation of this conflict is shown in his testimony as follows:
“Q. Let me ask you this in view of that statement. Could the possibility that muscle spasm did not exist on the date that you examined him and that it existed on the date or on the following day when Dr. Gilly examined him be attributable to any other cause that you can medically explain? A. Yes; the man may have done something in an attempt to injure himself.
“Q. In an attempt to what? A. To injure himself.
“Q. You mean after your examination of him? A. Yes, sir.
“Q. Is that a remote possibility or is that a probable situation? A. I couldn’t answer that, sir.
“Q. Couldn’t it be explained medically by the fact that a herniated disc is characterized by symptomatic episodes of exacerbation and remission? A. Yes, sir.
“Q. Then that could well explain the difference of opinion? A. Possibly.”
If we are to reconcile the difference in the medical testimony in this case it can only be done by the diagnosis of a herniated disc as shown in the above testimony.
In addition to the medical testimony the plaintiff has offered the testimony of various employees as to the accident and his. complaint of injury and as previously-stated there is not the least doubt that he did suffer an accident and injury.
We also have the testimony of plaintiff’s wife to whom he has been married approximately 12 years. Plaintiff also had one little girl born of this marriage. His wife testified that he came home about three or four o’clock, cleaned up and went to bed and that since that time he has not been engaged in any work; that he had seen Dr. Trahan and gone to the Lady of Lourdes hospital' in Lafayette and spent approximately six days and that during that time she was there at night and stayed with him; that he stayed in bed with his feet in traction. She testified that the plaintiff suffered a lot at times and that he could not stay in bed “nor sit nor stand too long.” He had to change positions. She rubbed him with alcohol and Sloan’s liniment and gave him sedatives. On some-. *151 nights she had to get up twice a night to rub him. She also evidently had a light because she-testified she gave the plaintiff light treatments and that his suffering would apparently slack for a while, and at the time of the trial he took the light treatments only when he suffered. She stated that prior to the accident her husband was always working outside of the house but that since the accident he had tried to mow the yard once after Dr. Gilly had told him to do so and that he could not finish mowing the lawn due to the pain and that night that she had to rub him two or three times. When asked where she would rub him, she stated: “Taking from here back to his right leg.” She indicated the lower part of the back going all the way toward her right leg down to her knee. Before the .accident plaintiff never complained of any pain in his back but since the accident, of •course, he has, and he has been unable to do any work. The sedatives or medicine which she administered to her husband were prescribed by Dr. Trahan.
It was shown that plaintiff’s wife worked .and supported the family by pressing, presumably in a cleaning shop, and made around $18 per week. Plaintiff’s wife testified that from the end of January and February was when the pain came down to plaintiff’s leg.
Based upon the testimony of Drs. Trahan, Gilly and Salatich and the lay testimony, it is ordered that the judgment of the District Court be reversed and that there be judgment in favor of the plaintiff and against the defendant awarding plaintiff compensation at the rate of $24.05 per week, payable weekly, beginning May 27, 1953, for a period not exceeding 400 weeks, subject to a credit of compensation previously paid in the amount of $673.40, together with 5% interest on each installment from its maturity date until paid and all costs. It is further ordered that the defendant be recognized as having paid $200 medical fees and plaintiff’s rights -to claim the excess allowed by law be reserved to him.
It is further ordered, adjudged and decreed that the fee of $50 each be fixed for Drs. Trahan, Gilly and Salatich and Meule-man and taxed as costs.
Rehearing denied.
TATE, J., recused.
CAVANAUGH, Judge ad hoc by appointment.